## [No. 3283.]

### James Miller v. The State.

1. MURDER — CONTINUANCE — PRACTICE — NEW TRIAL — CASE STATED.— Being charged with the murder of one C., who was assassinated at night, the special defense relied upon by the appellant was *alibi*. To obtain testimony in support of that defense he applied for a continuance, but his application was overruled and he was forced to trial and convicted of murder in the first degree. In his motion for new trial the refusal of the continuance was one of the grounds relied on. The diligence alleged in the application for a continuance was *prima facie* sufficient, and was not contested in the mode provided by articles 564 and 565 of the Code of Procedure. The motion for a new trial was overruled. *Held* that, under the sixth subdivision of article 560 of the Code of Procedure, the motion for new trial brought in review before the trial court, and brings in review before this court, the allegations of the application for continuance and all the evidence adduced at the trial, which allegations and evidence are to be considered together in determining whether the trial court erred in refusing a continuance and a new trial. Said article 560 supplies the test, and it consists of the twofold inquiry whether, 1st, the testimony as alleged in the application for continuance is of a material character; and 2d, whether the testimony so alleged is probably true. Affirmative answers to these two questions entitle the defendant to a new trial, not as a matter of judicial discretion, but as a legal right; because they demonstrate that the continuance should have been granted, and that injustice was probably done the defendant by the refusal of the continuance.

2. SAME.— The State fully proved the assassination, and fixed its perpetration at or about a particular hour, but the evidence inculpatory of the appellant was wholly circumstantial. The evidence at the trial located the defendant at a distance of more than three miles from the place of the assassination, both before and after its perpetration, but failed to show where he was for an interval of an hour or so, in which, as contended by the State, it was practicable for him to have perpetrated the assassination. Appellant was refused a continuance sought for the purpose of procuring testimony to prove his whereabouts during the interval of time not accounted for by the evidence at the trial, and which desired testimony would have tended strongly to support his defense of *alibi*. Being convicted, he moved for a new trial, and assigned the refusal of the continuance as a ground of the motion. Being refused a new trial, he appealed. Note, *in extenso*, the opinion of this court for a lucid exposition of the provisions of the Code of Procedure upon such a state of case, and for a review of the inculpatory evidence in connection with the testimony set forth in the application for continuance, demonstrating the materiality and probable truth of the absent and desired testimony, and the error in the refusal of a continuance and a new trial.

3. SAME.— No rule of law or logic authorizes a court to justify its rulings by the assertion or assumption that any one unimpeached witness was more credible than other unimpeached witnesses.

4. SAME — PRACTICE.— When the trial court entertains a reasonable doubt in regard to the right of a convicted defendant to a new trial, in consequence of the overruling of his application for a continuance asked for the purpose

of securing material testimony, and denied primarily because of the questionable truth thereof, the doubt should be resolved in his favor.

5. EVIDENCE — DEMEANOR OF DEFENDANT.— In a trial for murder a State's witness was allowed, over objection, to state that he saw the defendant about three quarters of an hour after the assassination, and that the defendant asked him the hour, "was excited," and his appearance was unusual. *Held* not error, in view of the control allowed to trial courts in the conduct of trials.

APPEAL from the District Court of Coryell. Tried below before the Hon. T. L. Nugent.

Upon an indictment charging him with the murder of John Coop, in Coryell county, Texas, on the 30th day of July, 1884, the appellant was convicted of murder in the first degree, and was awarded a life term in the penitentiary as his punishment.

W. T. Vincent was the first witness for the State. He testified that he lived on Plumb creek, in Coryell county, about eight miles northwest from Gatesville. He knew the deceased, John Coop, in his life-time, who lived about one mile distant from the witness's house. He had known the defendant something over a year, during which time he had lived with the deceased. The defendant and the deceased were brothers-in-law, the deceased having married the sister of the defendant. Witness saw the dead body of the deceased at his house in Coryell county, Texas, a little after 9 o'clock on the night of July 30, 1884. The body was lying on the ground at the south end of the gallery, which is on the front and east side of the deceased's dwelling. Coop's wound was in the breast, ranging a little upward and entirely across from the left to the right side of the breast, laying the breast bones bare. This wound was as wide, all the way across, as the witness's three fingers. Another wound, inflicted by three bullet holes in a space that could be covered by a silver dollar, entered the deceased's back. Two of the balls came out at the breast, and the third one lodged under the skin. A messenger named Jake Fulton was sent for witness, and witness arrived at the house of the deceased on that night. John A. Moore went with the witness. They found at the house of Coop, Mrs. Coop, William Miller and his wife, and Mrs. Cynthia Miller, the defendant's mother. Of these parties only William Miller was seen about the body of Coop. Some time after the arrival of witness and Moore, the defendant, Gus Spradley, and, the witness thought, Lee Basham arrived. After the arrival of this last named party witness and Spradley went to Gatesville to get an officer. He did not remember whether or not defendant had anything to do with sending for the officers. Wit-

ness got back to Coop's house about 2 o'clock. An inquest over the dead body was held next day. When witness first got to Coop's house he saw a bed or pallet lying on the front gallery floor, near its south end, the pillow resting against the wall of the house. He found also that a load of buckshot had struck and entered the corner of the house, the highest shot-hole being about eight inches above the floor, and the lowest about three inches, all of them in a twelve-inch plank, which plank was the bottom one. Before and just as witness started from home *en route* to Coop's house, he looked at his clock, and saw that it was just fifteen minutes before 9 o'clock. From the location of the pallet, the wounds in Coop's body, and the range of the shots in the wall, and experiment by sighting, the witness was certain that the party who fired the fatal shots stood, at the time of the shooting, at the middle of the gallery and on the front step.

Sam Landis was the next witness for the State. He testified that he lived in Coryell county, nine miles west from Gatesville, and three and a half miles from the residence of the late John Coop. He was acquainted with Coop in his life-time, and had known the defendant about three years. Coop and defendant were brothers-in-law, and the latter had lived at the house of the former for some time prior to the assassination. At about 11 o'clock on the night of July 30, 1884, witness, who had been to camp-meeting on Plumb creek, heard of the homicide, and went to Coop's house from Gus Gilbert's place, where he was when he heard of it, and found, at Coop's, Mr. W. T. Vincent, John A. Moore, the defendant, and others. The dead body of Coop lay on the ground at the south end of the gallery. The defendant was asked if he knew anything about how the deceased came to his death. In reply he pointed to his brother, William Miller, and said: "He was here." Witness found on Coop's breast a glancing wound, which was evidently made by a load of buckshot, and a wound which entered the back to one side of the back-bone. This wound showed that three buckshot entered the back close together, two of them passing out of the body at the breast, near the right nipple, and the other lodging under the skin.

On the last plank of the house, which was a box structure, and near the corner, the witness saw the impression of seven buckshot, ranging from five to seven inches from the floor. Some two or more bed-quilts were folded and spread down on the floor near the south end of the gallery, forming a pallet, and a pillow lay on the end of the pallet nearest the wall of the house. The main house

was about sixteen feet in length, with a gallery running along the front or east side throughout its entire length. The gallery was about nine feet wide and about three feet above the ground. There was also a shed room attached to the west side of the house. The steps or approach to the gallery are about midway on the east or front side, and directly facing the front door of the main building. Directly opposite this front door another door opened into the shed or back room, and opposite this door another door led from the shed room to the back of the house. Witness made some experiments by sighting to determine where the party stood who fired the shots that killed the deceased, and found that, by standing on the front step of the gallery, the witness was brought within the range of the balls or buckshot that were imbedded in the corner of the house. The step-way to the gallery and the three doors described were in a straight line with each other, ranging from east to west. There was a window on the south side of the house.

Warren Abrahams was the next witness for the State. He testified that he lived in Coryell county, Texas, on Plumb creek, about nine miles from Gatesville. He knew the deceased in his life-time, and had been acquainted with the defendant about twelve months. Witness was at a camp-meeting on Camp Branch, on the night that Coop was said to have been killed, and saw the defendant at that camp-meeting on that night at about 7 o'clock. Witness heard early next morning that Coop had been killed on the previous night. When the witness saw the defendant at the camp-meeting at the hour stated, he was sitting under the arbor near to, and in conversation with, Miss Georgia Large. After a short time the defendant left the arbor and went towards the lemonade stand. He returned to the meeting ground about a quarter past 9 o'clock, walked up to the witness, and asked: "How long have they been cutting up this way?" Witness replied, "from three-quarters of an hour to an hour." Defendant then pulled out his watch and asked witness what time it was by his watch. The two compared their watches and found the two together at fifteen minutes past 9 o'clock. Defendant appeared excited when he came up to the witness. His general appearance was different from what it usually was. The camp-meeting closed for that night about an hour after the defendant's return to the grounds.

Jeff Coop was the next witness for the State. He stated that he and the deceased were half-brothers. He had known the defendant about two years. Witness was at the camp-meeting on the night that the deceased was killed. He heard of the assassination about

10 o'clock, when the meeting broke up. The defendant was at the camp-meeting on that night, and, when it broke up, he escorted Miss Georgia Large home. He then returned to the camp ground and he, with witness, Gus Spradley, and several others went together from the camp ground to the house of the deceased. When the party had progressed about half way on their route to the deceased's house, defendant said to witness: "I think James Gould killed John Coop. Keep still, and if he did we will get him." This was said in the presence of Gus Spradley.

The defendant was a stock man by occupation; was a good rider, and rode a much more than an ordinarily good horse that night. Defendant had frequently boasted of the speed of the horse he rode that night. About two weeks prior to this trial the witness rode from a point distant from the said Coop's house about one hundred and fifty or two hundred yards, to the said camp-meeting ground, and back again, stopping at the grounds five minutes, by Jim Coop's watch. Witness rode in a swift gallop or lope. A. T. Dooley was at the starting point with a watch, and Jim Coop with a watch was at the camp ground. Dooley held the watch and timed witness. Witness did not, of his own knowledge, know the time in which he made the distance ridden by him. Witness was frequently at Coop's house during his life-time, and a week or two before he was killed, while looking through his trunk, saw five or six buckshot in the tray.

Cross-examined, the witness testified that the nearest route from Coop's house to the camp ground was three and a half miles over a rough, broken road, which was the road ridden over by witness, on a good average pony. By the usually traveled road the distance is about one mile further. Defendant did not own the only good horse in that neighborhood.

A. T. Dooley, a brother-in-law of the deceased, testified that he had known the defendant since 1874. Defendant made his home at deceased's house for two or three years before the death of Coop. Witness was at the camp-meeting on Camp Branch on the night that Coop was killed. Witness was present at the point from which, about two weeks before this trial, Jeff Coop started to ride the trail or shortest route between Coop's house and the camp ground. Witness held the watch by which Jeff Coop started, and timed him while gone, and that time was thirty-five minutes. Witness also stepped the distance from near Coop's house to the camp ground, and found that distance to be about three miles and seven hundred and seventy yards. The route measured was nearly a direct line

from Coop's house to the camp ground. This was a rough, broken route across uneven breaks in the creek. There were two other open roadways between Coop's and the camp ground. Over the main road the distance was about four miles.

Miss Georgia Large was the next witness for the State. She testified that she lived at present in Comanche county, but formerly lived near Simpsonville, in Coryell county. She lived there in July, 1884, on the place with her mother, about a half mile from the camp-meeting ground, on Camp Branch. On the evening of the assassination of John Coop, the defendant and Lee Basham came to the house of the witness's mother, and accompanied witness and her sister to the camp-meeting. The party reached the camp-meeting ground a little before dark. The defendant went into the arbor with the witness, took his seat by her, and remained until the services began, when he excused himself and left. He was gone quite a time, and when he returned the regular service was over, and the shouting was in progress, having, however, but a few minutes before commenced. He then remained with the witness until the meeting broke up, and then escorted her home. As soon as the defendant left the witness when the preaching began, Martin Wilkins took the seat by witness which the defendant vacated, and remained with the witness until the defendant returned and resumed the seat.

Cross-examined, the witness stated again that the defendant left her just as the preaching began, and returned just after the shouting began; then remained with her until the services closed, and escorted her home. While *en route* to the witness's home, the party was overtaken by Gus Spradley, with the news that John Coop had been killed. Previous to this the witness had observed nothing unusual in the defendant's manner and demeanor. He had conversed and deported himself in his usual manner. When Spradley told him of the assassination of Coop, he remarked: "It is too bad," and from that time until he left the witness at her home, he had but little to say. He did not go into the house with the witness and her sister, but he and Lee Basham left witness and her sister at the gate, and went back in the direction of the camp ground and Coop's house.

Miss Missouri Large was the next witness for the State. She testified to the same facts that her sister did, except she knew nothing about the defendant leaving her sister after reaching the camp meeting. Lee Basham escorted the witness to the meeting and back home, remaining with the witness throughout the meeting.

Sheriff James Lanham testified that he reached Coop's house on

the morning after the assassination.   Some time during the day he ordered a search made for weapons.   William Cole found a double-barreled shot-gun in William Miller's wagon, which stood in the horse lot, a short distance from Coop's house.   Witness did not see the gun taken from the wagon, but saw it a few minutes afterwards. It had been recently discharged, judging from indications.   The insides of both barrels were black, and there was an appearance of powder-burn around the tubes.   The caps on the tubes were bright.

Cross-examined, witness said that he drew the loads from the gun, and found it charged with squirrel-shot.   A piece of checked cloth was placed over the caps, and the hammers rested on the cloth. Some two or three days later, witness saw two brass shot-gun shells lying very near to a small tree a short distance off from the Gatesville and Hamilton road.   Jake Fulton piloted the witness to these shells and told the witness that he found the shells where they lay, a day or two before, when he went out to drive up his cows.   The shells, which were of the kind that could be loaded and used an indefinite number of times, appeared to be old ones.   They showed no indication of recent use.   One can tell as readily whether a shell has been recently fired as he can whether a gun has been recently discharged.

W. R. Basham was the next witness for the State.   He testified that he knew the deceased in his life-time, and knew the defendant, who was his, witness's, nephew.   Near noon, one day about four weeks before the killing of Coop, the defendant came to witness's house and dined with him.   While there he told witness that he wanted to borrow the shot-gun which the witness had previously bought from him.   Witness told him that he could get it, and, at the same time, took occasion to tell defendant that the gun would not shoot buckshot as well as he had represented that it would. Defendant replied that witness did not know how to load it correctly.   He then loaded the gun with buckshot for the witness, fired it, and demonstrated to witness that it would shoot buckshot as he had stated it would.   He then asked witness to take the gun from the house and hide it about the lot where he could get it, which witness refused to do, and asked him what he wanted with the gun.   Defendant then told witness that he wanted to get John Coop with it.   Witness then told him that he could not get the gun, and advised him to "let that matter alone."   He replied, " James Gould will do the work."   He said that Gould would have done the work before, but his nerve failed him.   The witness's gun spoken of was a double-barreled breech-loading shot-gun.

Again, about July 25th, there was a picnic in the neighborhood, from which the defendant came to the witness's house, after night. The witness and his wife had retired for the night, sleeping on the gallery. When the defendant came up, witness's wife asked him if he had yet had supper. He said no, but that he did not want any. Nevertheless the witness's wife went to prepare his supper, and, while she was gone, defendant asked witness to have his wife sleep in the house, so that he might sleep on the gallery with witness, and for witness to get his gun out of the house and put it where he, defendant, could get it, and he said: "I can then go down yonder and get off with that fellow, and get back here before day." Witness told him that he could neither sleep with the witness nor have witness's gun. Witness had a talk with John Coop a short time before he was killed, and warned him of his danger.

On cross-examination, the witness said that the defendant did not get his gun, and that his gun was at home in his possession on the night that John Coop was killed. When defendant last asked for the gun he did not use Coop's name, but used the words "that fellow." The way that witness came to tell Coop of his danger was this: Coop told the witness in that conversation that in taking his jack to water a few days before, he caught Jim Gould waylaying him. In the same connection he asked witness if he, witness, knew how the defendant was disposed towards him. Witness then told him of what passed between him and defendant, as above narrated, and advised him to be on his guard. Witness had always maintained friendly relations with both Coop and the defendant.

Mrs. Cynthia Riddle, a half sister to the deceased, testified for the State that she was at Gabe Smith's house on the night of the assassination. Between an hour and an hour and a half after dark, guessing at the time, the witness heard two gun shots. The last shot was very loud.

Lee Basham was the next and most important witness for the State. He testified that he knew John Coop in his life-time, and was a cousin to John Coop's wife. Witness was at Coop's house the day before the night of his assassination. Defendant was there, and the two took dinner at Coop's and went from there to the camp-meeting ground, arriving on the ground about an hour before sunset. *En route*, defendant said to witness: "I am going to kill a fellow to-night." Witness earnestly advised defendant not to do it. From the camp-meeting ground the witness and the defendant went to Mrs. Large's, and escorted the two Misses Large to the camp-meeting, arriving there about dark. Defendant went under the

arbor with his company, sat there with her for a short time and got up and left. He was gone for some time, but returned in time to go home with the young ladies. *En route* to Mrs. Large's house the party was overtaken by Gus Spradley, who informed them of Coop's death. After witness and defendant left Mrs. Large's, and while on the way to Coop's house, defendant said: "I got off with that fellow. You thought I did not have the nerve to do it; but, G—d d—n him, I got him all the same."

Cross-examined, the witness stated that he and the defendant went directly from Mrs. Large's to John Coop's house, and did not go by the camp ground. Gus Spradley, Jeff Coop and others fell in with them on the way. No one was present when defendant told witness that he had "got off" with "that fellow," nor at the previous conversation, in which he said that he was going to kill a fellow that night. Witness told no one about these conversations until after this term of the court convened. Witness left the neighborhood a few days after the killing of Coop, and did not return until recently. He went to the Duffau Wells. Witness first told the grand jury, in the grand jury room, about these conversations, at the present term of court. When first taken before the grand jury, the witness denied that he knew anything whatever bearing upon this case, but went back in a couple of days and told the grand jury the same facts he has just now deposed to. Witness did not remember whether or not he was sworn by the grand jury on either occasion. Witness had not heard that a reward of $300 had been offered for the witness who would give testimony which would convict the defendant of the murder of John Coop. The defendant, in the first conversation referred to in witness's direct testimony, did not say who he was going to kill, nor did the witness ask him. He did not, in the last conversation, say who he had got off with, nor did the witness ask him. Witness and defendant were on good terms in July, 1884, and still were.

W. S. Cole testified, for the State, that he was a deputy sheriff of Coryell county, Texas, in July, 1884. He went to Coop's house on the morning after the assassination. Some time during the afternoon of that day he aided in searching the premises for fire-arms, and found a double-barreled shot-gun in a wagon in the horse lot near the house. The wagon had a sheet over it, and the gun was folded up in a mattress. Some quilts were wrapped around the mattress, and a "slicker" was thrown over all.

Luke Weaver testified that he was at the camp-meeting on Camp Branch on the night that Coop was killed. Witness reached

the ground a little after dark, and just as he got there he met two men, riding horseback, about half way between the camp ground and the ford of Plumb creek. One of these men the witness did not know, but he took the other to be the defendant. Witness knew the defendant, and declared that, to the best of his knowledge and belief, the defendant was one of the two men he met.

Cross-examined, the witness testified that he would not swear with absolute certainty that the defendant was one of the two men he met between the ford and the camp ground. The man looked like the defendant, and the witness, at the time, took him to be the defendant. Neither the man nor the witness spoke. This meeting occurred after dark and after the preaching had begun. The two parties mentioned were riding in a walk, going north from the camp ground. Coop lived east from the camp ground. The ford on Plumb creek, spoken of, was some two or three hundred yards distant from the camp ground. The man the witness took to be the defendant was riding a dark-colored horse. Four roads centered at the ford towards which the parties met by witness were going, one of which led to Coop's. That road turns somewhat back down the creek from the direction in which the two men were then going. The State rested.

William Miller, a brother to the defendant, was the first witness introduced in his behalf. He testified that he was now, and for sixteen years had been, a resident of Robertson county, Texas, except for about eighteen months, several years ago, when he lived in Coryell county. John Coop's wife was a sister to the witness, and witness's mother lived at Coop's house in July, 1884. Witness came up on a visit to his relatives at Coop's house, arriving on Sunday. He remained there until the following Tuesday, when he left, going to Hamilton county on a visit to a brother-in-law. He remained in Hamilton county until the following Tuesday, and then returned to John Coop's house, where he remained until Wednesday night,— the night of the assassination. Witness had his wife and children with him, traveling in a two-horse wagon and camping out at night. Witness had in his wagon, which he brought with him from home, a trunk, a mattress, some bed clothing, some family supplies and a gun. Witness and his wife, Jake Fulton and witness's children were sleeping in a house in the northwest part of the yard on the night when John Coop was killed. Witness had retired early and gone to sleep, but was awakened by the first report of the gun. This first shot was indistinct and sounded to witness like the slamming of a door. The second was a distinct shot, immediately after

which the witness heard Coop call: "Come here, Bill." Witness's wife was very much frightened and clung to the witness for some little time. As soon, however, as witness could release himself, he ran out and found Coop lying on the ground at the south end of the gallery, face downwards, and struggling in his efforts to get to his feet. Witness took hold of him and gave him a pull, and he turned over on his back, gave a few gasps and died.

Seeing that Coop was dead, witness went back and told Jake Fulton to get his clothes on immediately and summon some of the neighbors. Coop did not speak after witness got to him. Witness saw the defendant and the deceased together on the day before the latter was killed, and they appeared to be perfectly friendly. Witness carried his gun suspended from some straps tacked to the wagon bows. Witness fired off one of the barrels while in Hamilton county. The gun was loaded with squirrel shot when the witness got to Coop's house. Witness left all of his things, including this gun, in his wagon when he got to Coop's house. Witness always kept a piece of cloth between the tubes and hammers of his gun. When found in the wagon by the deputy sheriff, the gun was in the same condition as when brought to Coop's house by the witness on the day before. Some two or three hours after the death of Coop, there being some appearance of rain, witness went to his wagon, removed his gun from the straps, wrapped it up in the mattress, wrapped the mattress in the quilts, put the bundle on the trunk, and covered the whole with a "slicker." He made this disposition of his things to protect them from the rain.

Cross-examined, witness said that neither his wife nor Mrs. Coop, nor old Mrs. Miller, went to the body of Coop at any time after he was shot. Witness went to the door of his room as soon as he could release himself from his wife, after the shooting, and though there was a bright moon shining he saw no one, nor did he think at the time of looking for any one. He heard something out toward the Hamilton road that sounded like the running of horses.

W. W. Hammack was the next witness for the defense. He testified that he was at the camp-meeting on the night that Coop was killed. He saw the defendant and a young lady when they arrived at the camp ground between sundown and dark. He saw them go into the arbor together. This was before preaching began. About this time witness went off some two hundred yards to get his supper. He did not return to the arbor for a half or three quarters of an hour. When he did return he saw the defendant standing near the arbor, talking to some parties. Witness went on to the spring

to get water. Returning in about fifteen minutes, he saw the defendant standing at about the same place, still engaged in conversation. In a few minutes witness and defendant left that place together, in a leisurely walk, the witness leading a small child, to a lemonade stand which stood a hundred or a hundred and fifty yards distant from the arbor. Witness and defendant drank a glass of lemonade, stood at the stand talking for some fifteen minutes, and then walked slowly back to within a short distance of the arbor, where they sat down and talked about fifteen minutes and then separated, the defendant going towards the arbor. They separated about 9 o'clock. Witness saw defendant again about 10 o'clock, when the meeting broke up. The defendant was not out of the witness's sight thirty minutes at any one time from the time witness returned from his supper until the shouting began. Defendant was longest out of witness's sight, that night, when witness went to his supper. Preaching had just commenced when witness returned from his supper and found the defendant standing near the arbor. All of witness's statements as to time were made upon supposition, as he had no watch. The shortest distance between Coop's house and the camp ground was two and a half or three miles. The sun set on July 30, 1884, at 7 o'clock.

Miss Maggie Stubblefield was the next witness for the defense. She testified that she was at the camp-meeting on the night of the assassination of John Coop, and saw the defendant there. He came to where the witness was sitting under the arbor about the time that preaching closed, and before the shouting commenced, sat down by her, and conversed with her for about fifteen minutes. This was before the mourners were called for. When he left the witness he went towards the seat occupied by Miss Large, and the witness afterwards saw him with Miss Large. She saw him leave the grounds with Miss Large when the meeting closed. Witness noticed nothing strange or unusual in the defendant's conduct that night.

Cross-examined, the witness said that she had heretofore told the facts she testified to, to Mrs. Slessman, to Mr. Shipman, and to Mr. Thacker. Witness came to court with the defendant's sister, Mrs. Coop. She had no other way to come. The defendant was merely an acquaintance,— no more to witness than any other young man.

Arthur Lee testified, for the defense, that he was at the camp-meeting on the night in question, and saw the defendant sitting on a bench on the outskirts of the congregation. Defendant at that time directed witness where to find his brother, for whom he was hunting.

Mrs. Sharp testified, for the defense, that she saw the defendant at the camp-meeting on the night in question, after the services had commenced. She did not know the time. She asked defendant if he had seen her little child wandering about. She noticed nothing unusual about his appearance.

Miss Emma Humphries testified, for the defense, that on the night in question, and at the period of the services when mourners were being called, she saw the defendant standing near the altar, leaning against a post. He was in her sight for at least fifteen minutes. Preaching began that night at early candle light. The sermon was very short,— very much shorter than was usual.

Fayette Haynes testified, for the defense, that he lived in Coryell county, Texas, and was familiar with the country from the camp-meeting ground on Camp Branch to the house of the deceased. The nearest route was three and a half miles over a dim trail and rough ground. The main roadway is rough, and about four and a half miles. There were three or four residences on either route, between the camp ground and Coop's house.

Mrs. Georgia Coop, widow of the deceased and sister to the defendant, testified in his behalf that the defendant, who had lived with witness and Coop ever since their marriage, left Coop's house about 4 o'clock on the evening of the fatal day. Witness was sleeping in the house at the time of Coop's assassination on the gallery. Witness's bed was just in front of the door opening to the gallery. The shots awakened the witness, but she saw no one. The deceased and the defendant, at the time of the death of the former, were on the best of terms, and quite as intimate as brothers. The defendant owned no fire-arm save a pistol, which he loaned to the deceased the day before the killing. The deceased told the witness that he had fears of assassination. He had had some trouble about branding a colt, and the parties who claimed the colt came to the house, proved the property and took it away, and it was in this connection that deceased expressed fears of his safety.

Cross-examined, the witness stated that the bed in which she slept that night stood within three feet of the door, and immediately in front of it, which door opened to the front gallery. The door was standing wide open when the fatal shots were fired. She looked through the door to the gallery immediately after the second shot was fired, but saw nothing but a tree and the sky. Witness did not go to the body of her husband at any time after he was shot. She was pregnant at the time, and a short time after the killing gave birth to a child.

Jake Fulton, who would attain his thirteenth year of age in May,

1885, was the next witness for the defense. Witness was living at the house of the deceased when the killing occurred. Deceased was the witness's uncle by marriage. The defendant was an uncle to the witness. Witness was sleeping in the room with his uncle William Miller and his family, at the time of the killing. That room stood some little distance off from the main dwelling-house, in the northwest part of the yard. Witness was awakened by the first shot, which was so indistinct that it sounded like the slamming of a door. The second shot was clear and distinct. Witness jumped from bed, exclaiming: "What in the devil is that?" Witness saw his uncle William leave the room, but remained in the room himself, until his uncle returned, when he put his clothes on. Witness's uncle said that some one ought to go for the neighbors, but that he did not know how to reach any of their houses. Witness agreed to go, and did go, riding a horse which William Miller caught and saddled for him. He went first to Mr. Vincent's, then to Mr. Moore's, then to Mr. Lanham's, and then to Mr. Smith's. Witness rode in a slow lope to Mr. Vincent's.

A day or two after the assassination of John Coop, the witness, who was driving cows up, found two brass shot-gun shells, lying near a small tree about one hundred and fifty yards from the house, and near the Gatesville and Hamilton road. Witness did not touch them, but told his grandmother, Mrs. Miller, about his discovery, and she directed witness to show them to Mr. Lanham or some one else. Witness had lived two or three years at the house of the deceased, and during that time had never heard a hard word passed between the defendant and the deceased.

John A. Moore was the next witness for the defense. He testified that he lived on Plumb creek, about one mile from the house of the deceased. He was at home on the night of the assassination. Jake Fulton came to witness's house about 9 o'clock on that night, and told him about the killing, and witness went by Mr. Vincent's, whence he and Vincent went together to Coop's house. Witness had no time-piece, and in stating the hour of Jake Fulton's arrival at his house to have been 9 o'clock, he spoke by guess. The shortest distance from Coop's house to the camp-meeting ground was three and a half miles. The distance by the main road was four or five miles. Both routes were rough.

The defense here produced an almanac, by which it was established that the sun set on July 30, 1884, at two minutes past 7 o'clock, and that the moon set at 12 o'clock on that night.

Gus Spradley was the next witness for the defense. He testified

that he heard of the killing of the deceased on the night that it happened, and went after the defendant. He overtook the defendant and Miss Georgia Large *en route* to Mrs. Large's, and told him of the death of the deceased. Defendant seemed to be much surprised and said: "Can it be so?" He then asked witness to return to the camp ground and wait for him, which the witness did. Defendant soon joined the witness, and the two, with others, went to Coop's house.

W. S. Cole, recalled by the defense, testified that on one occasion he was sent for a doctor ten miles distant in great haste. He was furnished a good horse and directed to ride him without regard to consequences. Witness rode that horse at his best, and he was an hour in making the ten miles, arriving with the horse completely broken down. That horse could not, in the opinion of the witness, have traveled a single mile further. The distance was never measured to the witness's knowledge, but was called ten miles.

W. H. Belcher testified, for the defense, that he was a member of the grand jury impaneled at the present term of court. Lee Basham was before that body twice, and was sworn each time before being questioned. At this point the defense closed.

William Wilkins was next introduced by the State in rebuttal. He testified that he was at the camp-meeting on the night of the assassination of John Coop. He saw Miss Maggie Stubblefield there that night. Defendant did not sit down by and talk to Miss Stubblefield during the services. Witness occupied a position from which he could have seen defendant if he had done so. Witness was out of view of Miss Stubblefield but once, and then for only ten minutes.

The motion for new trial presented the questions discussed in the opinion.

*X. B. Saunders, C. P. White, O. Miller* and *J. L. Crain,* for the appellant. The first ground set out for a new trial is that the court erred in overruling defendant's application for a continuance.

Prior to the adoption of the Code of 1879, the grounds for a continuance were five, identical with the first five in the Revised Code. The Revised Code adds another, the 6th. (Revised Code, art. 560, sec. 6.)

Under the law, as it was prior to the adoption of the Code of 1879, when the first application for a continuance met the requirements of the law, the case was continued of course. (*Sansbury* v. *The State,* 4 Texas Ct. App., 99; *Stephenson* v. *The State,* 5 Texas Ct.

App., 79; *Tooney* v. *The State*, 5 Texas Ct. App., 163; *Farrar* v. *The State*, 5 Texas Ct. App., 489.) And it was error in the court below to refuse it. (*Austin* v. *The State*, 42 Texas, 345; *Peeler* v. *The State*, 2 Texas Ct. App., 455.)

An application for first continuance in the terms of the law relieved the court of its discretion, and the continuance was granted as of course. (*Jenkins* v. *The State*, 30 Texas, 444.)

Thus stood the law before the adoption of the Revised Code, giving the continuance as a matter of right when applied for in terms of the law.

Upon the revision of the law, section 6 was added to article 560, and it requires the defendant, in addition to the things required under the old law, to swear that there is no reasonable expectation that the attendance of the witnesses can be secured during the present term of the court, by a postponement of the case to a future day of the term; an entirely new departure, and an innovation, to my mind, without reason and unsafe, as are many of the innovations upon the administration of criminal law, and especially those made at the behest of fanatical clamor. And, taken in connection with the rest of the section, "That the *truth* of the first or any subsequent application and the *merits* of the *grounds* set forth therein; and its *sufficiency* shall be addressed to the sound discretion of the court called upon to pass upon the same, and shall not be granted as a matter of right," if to be construed as by the court below (however unsound the discretion, he, alone, is the judge of its soundness), it renders the rights of a citizen accused of crime as uncertain and variable as are the caprices of men; and the attorney, however learned and talented, as ignorant of the rights of his clients as the veriest blockhead court hanger-on in the land. For each successive step is taken in the dark, both in his preliminary preparation for trial (for there is no certainty as to the result) and in the trial itself, for he has no assurance that he will not be forced into trial without witnesses, however good a defense he may have. So that no honest lawyer would dare to tell a client what would be the probable result of any step taken in his case. And at the end, how can he say that the court will not regard his testimony as immaterial and refuse a new trial, or, if material, untrue and refuse a new trial. But we regard the matter contained in section 6, article 560, not so much a matter of diligence as an evidence of good faith on the part of defendant; that is, he knows of the testimony and desires the witnesses.

Now, under the old law the discretion of the court was relieved

upon an application for a continuance in terms of the law as to the continuance. So under the new law the discretion of the court is relieved upon an application for a continuance in terms of the law (of the old law) as to a new trial upon a motion founded upon the overruling of the application for continuance. In other words, the end of discretion is simply changed from the application for a continuance to the application for a new trial. In the case of *Garcia* v. *The State*, 15 Texas Ct. App., 120, the court says: "Were the facts set forth in the application probably true? If so, it was error to refuse defendant's motion for a new trial. See also this case for facts which render the probability of the truth of the testimony sought a bare one, and yet the court declares it sufficient to grant a new trial.

In the case of *Mapes* v. *The State*, 14 Texas Ct. App., 135, the court says: "Were the facts expected to be proved material and probably true?" And, after showing the materiality of the testimony, and the little conflict between the evidence of the absent witness and that offered by the State, the court declares the evidence to be of the first importance. So in the case at bar, there is nothing in the evidence offered by the State to render it the least improbable that the testimony of these witnesses, Hall, Wilkins and Thacker, was not true. Wherefore we conclude from the authority of our own court: "That, whenever there are facts stated in an application for a continuance which would have entitled a defendant to a continuance under the old law, and diligence is shown, which under the old law would have been sufficient to entitle him to a continuance, this court will always reverse because the court refuses a new trial under the new law." (*Miles* v. *The State*, 14 Texas Ct. App., 436; *Lawson* v. *The State*, 13 Texas Ct. App., 264; *Pinckord* v. *The State*, 13 Texas Ct. App., 468.)

And although the showing may be insufficient to entitle the defendant to a continuance in the first instance, yet, when taken in connection with the facts proven on the trial, if the absent testimony proves to be material, and is presented to the court by a motion for a new trial, it will entitle defendant to a new trial. (*Tyler* v. *The State*, 13 Texas Ct. App., 205.)

In that case the defense was an *alibi*. So in the case at bar. In the Tyler case sufficient diligence had not been shown to get the testimony. In this case there is sufficient diligence shown; only as to Hall and Thacker it was not in the first application stated that appellant could not reasonably expect to get the witnesses at the present term of court. In the Tyler case the evidence is material

simply to show an *alibi.* In the case at bar the evidence of Hall, Thacker and Wilkins is not only material to show an *alibi,* but to clear up and explain one of the most, if not the most, criminating circumstances in the whole case made against the appellant by the State.

Although I may have said too much, yet I cannot pass this branch of the case without calling the attention of the court to article 1, section 10, of our Constitution:

"In all criminal prosecutions the accused shall have a speedy public trial by an impartial jury, etc. He shall be confronted with the witnesses against him, and shall have compulsory process for obtaining witnesses in his favor."

Now, is the declaration in the Bill of Rights that defendant shall have a speedy public trial, or that he shall have the right to demand the nature of the accusation against him, or that he shall not be compelled to testify against himself, or that he shall have the right to be heard by himself and counsel, or that he shall be confronted with the witnesses against him, of any more weight and importance, or can these declarations be any the less overridden than the declaration that defendant shall have compulsory process for obtaining witnesses in his favor? No, certainly. Nor are the former any more conducive to the ends of justice than are the latter. Then I submit that, if the construction placed upon article 560, Code Crim. Procedure, by the court below is correct (that is, that failing to swear that there is no reasonable expectation of procuring the testimony of the witnesses by a postponement of the case to a future day of the term defeats a defendant's right both to a continuance and a new trial), it renders nugatory section 10 of article 1 of the Bill of Rights, and converts article 560 into a snare and trap more dangerous than was ever the Spanish Inquisition. Appellant did have process issued, and did place it for service where the law required him to do, when it passed from his control, where neither negligence nor laches could attach to him in reference thereto. He did show that the testimony was in his favor. And that is all that is required by the Constitution to obtain witnesses in his favor. And forsooth, because he would not swear unequivocally that the witnesses were in a certain place, and would remain there a certain length of time, and that the officer, over whom he had no control, would or would not execute a process over which he had no control, his constitutionally guarantied process becomes a nullity, and he pays the penalty with his life.

But does section 6 of article 560 authorize any such construction?

I think not.  By previous sections the application must show the residence and materiality of the witnesses, and the diligence used, and by section 6 that there is no reasonable expectation of procuring their attendance, etc.; all of which shall be addressed to the sound discretion of the court.  Now, to what does the discretion of the court attach?  To the continuance, certainly, with a proviso that, if all these things are shown in the application, and the things in section 6 are not shown, the court in its discretion may overrule the continuance; provided, that, if the testimony sought is shown to have the character of materiality and the probability of truth, the court shall grant a new trial.  So it is clear to my mind that, under article 560, section 6, Code of Criminal Procedure, there is no more discretion in the court as to granting a new trial, when the absent testimony is shown to have the character of materiality and the probability of truth under the new law, upon motion founded upon the overruling of the application in terms of the law, than there was under the old law as to a continuance upon a showing in terms of the law.

Appellant complains that the court erred to his prejudice in permitting the witness for the State, Warren Abrahams, to express his opinion as to the appellant being excited at the camp-meeting the night Coop was killed.  This witness was asked by the State's counsel to give the demeanor of the defendant Miller when he came to witness during the services at the camp-meeting on the night that Coop was killed.  To this question the witness answered, " he was excited."  Counsel for appellant interposed an objection to this answer upon the ground that the answer was mere matter of opinion and not the statement of a fact, and for that reason should be excluded from the consideration of the jury, and the court overruled this objection and allowed the opinion of witness to go to the jury as evidence.

The question as propounded to the witness was not objectionable, but it is the answer that we complain of, and it is insisted that the refusal of the court to exclude the statement did appellant great injustice.

It is a general and familiar rule of evidence that witnesses are to state facts only, and that it is the province of the jury to draw conclusions from the facts given in evidence.  In this instance the witness is permitted to invade the duties of the jury.  We are well aware of the fact that there are exceptions to this general rule, but fail to see wherein the statement complained of falls within any of the exceptions.  All exceptions to the general rule seem to apply

solely to experts, such as scientific or professional persons called to give an opinion upon facts proven, and in some rare instances non-professional persons called to give an opinion when from the nature of the case the facts could not be stated; but surely this is not a case falling within any of the exceptions to be found in any of the authorities. Furthermore we understand the rule to be that even when experts are permitted to give their opinions in evidence, the facts are always first given in evidence, and then, if the facts are of such a character as to preclude the jury from making the proper deductions, experts may be asked for opinions, and not until then. In this case counsel for the State seemed to understand that the facts desired to be proven by this witness were subject to the general rule stated, and merely asked the witness for the demeanor of the defendant; thus indicating that they simply wanted the actions of the defendant given in evidence. But the witness answered this by expressing an opinion without giving a single fact upon which to base the opinion, and to this expression of an opinion counsel for appellant interposed their objection, and asked the court to say to the jury that this statement of the witness was not evidence; but the court overruled the objection, and we insist that in this way the opinion of an unlearned youth is made prominent, and the jury in effect are told by the court that this opinion is to be accepted by them, and weighed and considered as a fact sufficiently proven. If the witness had been confined to a statement of the actions of defendant upon the occasion referred to, and had the jury been left to draw their own conclusions as to whether defendant was or was not excited, the conclusion reached by them might have been very different. If the ruling of the court below is to be adhered to, then the enemies of one accused of crime, or those over-zealous for the prosecution, by substituting their opinions for facts would have the destiny of the unfortunate defendant in their own hands, and if such are to be permitted to come into court and give their opinions as to the state of defendant's mind when met by them, then, indeed, is the life of the citizen, when accused of crime, simply in the hands of his enemies, or any stupid fellow who has mind enough to express an opinion.

In the case of *McKnight* v. *The State*, 6 Texas Ct. App., 163, this court laid down the general rule to be this: The witnesses are to state facts only, and the jury to deduce therefrom the conclusions. And the court say further that a judgment even in a criminal case will not be reversed for immaterial errors, yet in such cases courts will rarely presume that the particular evidence which had been

wrongfully admitted could have no influence on the deliberations of the jury.

In the case now before the court the State relied on circumstantial evidence altogether for a conviction, and the court below, by overruling the objection made by counsel for the defendant, in effect said to the jury that the excited appearance of the defendant is a circumstance tending to show his guilt, and that this circumstance is sufficiently proven by the witness Abrahams giving his opinion in regard thereto.

This court said in the case of *Cooper* v. *The State*, 23 Texas, 331, that "when the jury are as competent as any other person to deduce the proper conclusion from a given state of facts, the opinions even of scientific witnesses are not admissible in evidence as to the conclusion or inference to be drawn from them." And further, "when it appears that the illegal testimony may have controlled the verdict of the jury, and, indeed, has been rendered prominent by the assumption in the charge of the court, that the evidence was proper and ought to be weighed by them, it is impossible to say that the verdict was not influenced by such testimony, and the judgment will be reversed."

In this case we insist that the testimony of the witness Abrahams was illegal, and that the statement complained of was given prominence by the court's refusal to exclude it, and that the jury was certainly influenced by it in making their verdict; and for these reasons the case ought to be reversed.

The fifth error complained of by the appellant is the action of the court in requiring the witness, William Miller, to answer the question by counsel for the State in regard to the witness's statements to D. W. Squires at Coop's house on the day succeeding the night on which Coop was killed, touching the question of witness having a gun on the place, and then permitting the witness Squires to be called and examined with a view to contradict witness Miller.

The question propounded to witness Miller was as follows: "Did you not, on the day succeeding the night Coop was killed, at Coop's house, say to D. W. Squires that you had no gun at Coop's house?" To which question counsel for appellant interposed an objection because the matter inquired about was irrelevant to the issue, and involved an inquiry into matter about which the witness could not be contradicted or impeached; but the court below overruled the objection and required an answer, and, witness having answered in the negative, Squires was called as a witness by counsel for the State, and interrogated about the conversation. It is true that after

Squires had been put to the test of a cross-examination, and it was developed that the witness Miller had said that Coop had no gun, then the court undertook to withdraw this evidence from the jury by telling them they should not consider it in making their verdict.

It is an established rule of law that a witness cannot be impeached by contradicting him about irrelevant matter. In the case at bar it was of no materiality whether the witness had said that he did or did not have a gun, and we insist that the course pursued by counsel for the State toward the witness was intended to and did place the witness Miller in a bad light before the jury, and that the court's permitting the course of examination to go on to the extent that it did was calculated to and did do much in the way of discrediting the witness, and that the attempted withdrawal by the court did not and could not repair the injury already done. It must be remembered that the witness is a brother of the appellant, and the State's counsel undertook to discredit him by innuendo and by implication, as was the course pursued with all of appellant's relatives, upon irrelevant and immaterial issues; and we are constrained to ask why was this course tolerated by the court below? How could the statement of the witness Miller as to whether or not he had a gun at Coop's house elucidate in any possible manner the matter at issue, and what excuse can be urged in support of the course pursued by counsel or the ruling of the court upon the matters complained of.

Mr. Greenleaf, in his work on evidence, lays down as a rule that all evidence must be confined to the issue in point, and this rule excludes all evidence of collateral facts or those which are incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute. The reason for this rule is that such evidence tends to draw the minds of the jurors away from the point in issue, and to excite prejudice and mislead them. (Greenleaf on Evidence, volume 1, pages 51 and 52.)

We submit that after the court had permitted irrelevant and collateral matter to go to the jury, and thereby poisoned their minds and excited suspicion against a witness, that the court cannot counteract the prejudice thus engendered by simply saying to the jury that this evidence is not competent, and should not be considered in making up the verdict. A jury will listen to and store away in their minds the evidence as it comes to them, and each and every statement of the witnesses, of course, makes an impression, and after all has been heard they form a conclusion from the whole mass of impressions thus made; and can one say just what particular evidence produced the convictions, or in other words can the juror say that

the evidence that was heard under the sanction of the court, and of course made an impression on his mind at the time, though afterwards withdrawn by the court, had nothing to do with his verdict, and will a court presume that such was the case? (*Stephenson* v. *The State*, 7 Texas Ct. App., 39; *Butler* v. *The State*, 7 Texas Ct. App., 635; *Walker* v. *The State*, 6 Texas Ct. App., 576.)

*J. H. Burts*, Assistant Attorney-General, for the State.

Willson, Judge. John Coop was murdered by some one, at his home, at about half-past 8 o'clock on the night of the 30th of July, 1884, by being shot to death with a shot-gun. On the 9th day of December, 1884, the defendant was indicted for the murder, and on the 22d day of the same month the case was called for trial, when the State announced ready for trial, and the defendant applied for a continuance because of the absence of material witnesses, to wit, Hall, Thacker and Wilkins, which application was overruled. Thereupon the court proceeded to the arraignment of the defendant, and the organization of a jury to try the case, but, failing to get a jury out of the special venire summoned, the case was postponed until the 24th, and two hundred talesmen were ordered.

When the case was again called, on the 24th, the defendant presented a supplemental motion for a continuance, and also a motion to change the venue. The court declined to pass upon these motions when presented, and proceeded to organize the jury, which was completed on the 27th day of the month. After the jury was organized, the court considered the supplemental application for a continuance upon its merits, and overruled it; and also passed upon the motion for a change of venue, overruling the same upon the ground that it came too late, having been made after the State had announced ready for trial, and after the court was proceeding to organize a jury.

Defendant was convicted of murder in the first degree, and his punishment assessed at confinement for life in the penitentiary. He moved for a new trial, which motion was overruled, one of the grounds of said motion being that the court erred in overruling his applications for continuance, and another ground being that the court erred in overruling his motion for a change of venue.

I. In considering the applications for continuance, we think they should be regarded as one and the same. The supplemental application referred to and made the original application a part of the former, and was considered and acted upon by the court upon its

merits.  They constituted together *one* application when entertained by the court, and will be so treated by this court.

II. There was no direct evidence that the defendant committed the murder.  No one witnessed the tragedy, and the deceased died in a few moments after being shot, and without making any declaration as to who did the shooting.  It is a case of purely circumstantial evidence.  The special defense interposed by the defendant was an *alibi.*

It appears from the evidence that a camp-meeting was in progress on the night of the murder, at a place distant from the place where Coop was killed, at least three and one-half miles by the nearest route.  The time of the killing is not exactly fixed by the evidence, but it must have been about half after 8 o'clock.  On that night the defendant accompanied a young lady to the camp-meeting, arriving there, she testifies, "about or a little before dark," and it was shown that the sun set on that day at two minutes past 7.  He remained with this young lady until preaching began, which was about early candle-lighting, when he left her and was gone away from her until the preaching was over and the shouting had commenced, when he returned to where she was, and accompanied her home.  The exact time of his return is fixed by the evidence at fifteen minutes past 9.  During his absence from this young lady he was seen and spoken to by several persons at and about the place where the meeting was being conducted.  There is, however, from the evidence, a short interval of time, perhaps near an hour, during which none of the witnesses who testified in the cause definitely located him at the camp-meeting.  This interval of time was sufficient to have enabled him to ride to Coop's, commit the murder, and return to the camp-meeting; and it covered the time when the killing occurred; that is, about half-past 8 o'clock.

In order, therefore, to make complete his defense of an *alibi* it was of vital importance to the defendant to prove his presence at the camp-meeting during this interval of time, and to prove the fact as strongly and conclusively as it might be possible for him to do.  He proposed to make this proof by the absent witnesses, Wilkins and Thacker.  By the witness Wilkins he proposed to prove that he, Wilkins, was present at the camp-meeting on that night, saw the defendant there from about 7 o'clock until 10 o'clock, and that defendant was within his view at said place during the whole of said time except at one time, and that he was out of witness's sight at that time not longer than fifteen minutes; and that the particular time when he did not see the defendant was before

half-past 8 o'clock. And by Thacker he proposed to prove substantially the same facts. By Hall and Wilkins he also proposed to prove other material facts not necessary to be now considered.

Considering together the original and supplemental applications for continuance, they contain every statutory requisite, and show due diligence to obtain the testimony of the absent witnesses. The learned judge, in his explanations appended to the defendant's bill of exceptions, says as to the witness Thacker that his residence was not stated in the application, and it could not therefore be determined whether the issuance of a subpœna for said witness to Coryell county was such diligence as the law required. In this statement the learned judge is mistaken, or the record before us is not correct; for in the application for continuance contained in this record it is stated that the witness Thacker resided in Coryell county, Texas.

We have seen that the facts which defendant in his application stated he expected to prove by the witnesses Wilkins, Hall and Thacker were material to his defense, and that due diligence had been used to obtain the testimony of said witnesses. As a first application for continuance it cannot be denied but that it was sufficient and, under the law as it aforetime was, must have been granted as a matter of right. (*Austin* v. *The State*, 42 Texas, 345; *Peeler* v. *The State*, 2 Texas Ct. App., 455; *Sansbury* v. *The State*, 4 Texas Ct. App., 99; *Stephenson* v. *The State*, 5 Texas Ct. App., 79; *Tooney* v. *The State*, Id., 163.)

But the act of April 14, 1879, which now appears as subdivision 6 of article 560 of the Revised Code of Criminal Procedure, invests the trial judge with a discretion as to continuances which never before existed in the courts of this State, and this discretion is a very broad one, qualified only by the requirement that it be a *sound* one. But it is provided that, if the defendant be convicted, and it has appeared upon the trial that the evidence of the witness or witnesses named in the application is of a material character, and that the facts set forth in said application were probably true, a new trial should be granted. In other words, on the motion for a new trial, the application for a continuance is to be reconsidered in the light of the evidence that has been adduced upon the trial, and if, when viewed in this light, it appears that the testimony sought is *material,* and that the facts stated in the application are *probably true,* justice and the law demand that a new trial should be granted the defendant; the application having in other essentials met the requirements of the statute.

Thus, the motion for a new trial brings in review before the trial

court, and before this court on appeal, the facts set forth in the application for continuance in connection with all the evidence in the case, and these facts and evidence are to be considered together in determining whether or not probable injustice has been done the defendant in compelling him to go to trial in the absence of the desired testimony. In so determining, the statute supplies the test by which the court is to be controlled. This test consists of answers to two questions, which are: 1. Is the testimony, as set forth in the application for continuance, of a material character; and 2. Are the facts stated in the application probably true? If both these questions can reasonably be answered affirmatively, the discretion of the court ceases, and the defendant is entitled to a new trial as a matter of right. Affirmative answers to these questions establish that the continuance should have been granted, and that probable injustice has been done him in refusing it.

In the case before us, as already remarked, the testimony sought is unquestionably of a material character. It bears directly upon the vital issue in the case, and, besides tending strongly to prove the *alibi* relied upon by defendant, tends to throw light upon other facts in evidence. The first of the test questions must be answered in the affirmative. How is the second question to be determined? Only, as we conceive, by considering the facts stated in the application, with reference to the facts developed by the evidence on the trial. In other words, does the evidence in the case render it improbable that the witnesses named in the application would testify to the facts which the defendant states he expects to prove by them; or does it appear that such facts, if testified to by them, are not probably true?

We will now examine the application as to the facts expected to be proved by the witness Wilkins, and compare the same with the evidence before us, and determine the question as to the probable truth of the application in this respect. It is stated that he expected to prove by Wilkins that he, Wilkins, was present at the camp-meeting on the night of the murder, and saw the defendant there from about 7 o'clock until 10 o'clock that night, and did not lose sight of him between said hours but once, which was before half-past 8 o'clock, and then only for not longer than fifteen minutes. Now as to the evidence on the trial. It was proved that Wilkins was at the camp-meeting on that night from 7 o'clock until 10 o'clock, and was acquainted with the defendant. It was proved that defendant reached the camp-meeting in company with a young lady at about 7 o'clock, and took a seat beside her under the arbor,

and in a short time left her and stepped out from the arbor, and that, when he left, Wilkins took his seat beside the young lady, where he remained until defendant's return. It was proved that when defendant left the arbor he went to a lemonade stand about one hundred and fifty or two hundred yards distant from the arbor, and remained at the stand about fifteen minutes, and then walked back to within a short distance of the arbor, and sat down on the ground and talked about fifteen minutes, and then got up and walked towards the arbor. Several witnesses testified to having seen him in the vicinity of the arbor at different places and times after he left his seat beside the young lady. There is no direct evidence that he was further away from the arbor on that night than the lemonade stand, from the time he went to the arbor to the time he left it in company with the young lady.

Is there anything in this evidence inconsistent with the truth of the facts stated in the application? Does this evidence render it improbable that Wilkins would testify as the application alleges he would; or that such testimony would not probably be true? The learned trial judge in his explanation to the bill of exceptions says: "The testimony sought to be obtained from Wilkins is entirely disproved by that of Miss Georgia Large, who testified that defendant went with her to the meeting; that when they arrived the defendant went at once with her under the arbor, sat down by her side, and remained until preaching began, when he at once arose and left and did not return until the preaching was over and the shouting was going on, and that when the defendant left her side Wilkins at once took his seat, and remained by her side until the defendant returned." We do not think the learned judge is justified in his conclusion that the testimony of Miss Large entirely disproves the facts expected to be proved by Wilkins. To our minds it is not at all improbable that Wilkins may have had the defendant in his view while Miss Large did not. Wilkins may have seen him from the time he left the side of Miss Large until his return, and yet Miss Large may not, during this time, have noticed his presence. We perceive nothing contradictory or conflicting in the testimony of Miss Large and the facts expected to be proved by Wilkins. Neither would disprove the other.

But, suppose the learned judge's view of it is correct, and that the testimony of Miss Large and the proposed testimony of Wilkins are in direct conflict, and incapable of being reconciled, are we to conclude that Miss Large is infallible, and that she alone could not be mistaken as to the facts? By what rule of reason or of law are

we to say that her testimony entirely disproves the testimony of another witness equally as credible, perhaps, as she is, and in as favorable a position as she was to observe and to know the facts testified about? We might with the same reason say that the testimony of some one witness in the case entirely disproved that of Miss Large.

We think the fair, just and reasonable way to solve this question is to consider *all* the evidence in the case, not particular parts of it, and if, when thus weighed and considered, it is not inconsistent with the truth of the facts set forth in the application, it should be held that those facts are probably true; and where there is a reasonable doubt in the mind of the court upon the question, the defendant should have the benefit of such doubt, as he would have in a trial before a jury. After a careful consideration of all the evidence before us, we must answer the second test question of the statute, as we did the first, affirmatively; and hold that the trial court erred in not granting the defendant a new trial upon the ground that his application for a continuance had been improperly denied.

We have not discussed in this connection the facts expected to be proved by the other absent witnesses Hall and Thacker, because it was sufficient for our purpose to consider the application only as to the witness Wilkins. We will say, however, that in our opinion the facts stated in said application, as expected to be proved by said witnesses Hall and Thacker, are not only of a material character, but are not unreasonable or improbable when compared with the evidence on the trial.

III. In regard to the ruling of the court upon the defendant's motion to change the venue, we will say that the question as presented in this case is not free from doubt and difficulty, and, as it is not necessary that we should now determine it, and as it may not arise again either in this or any other case, we prefer and think it best to not decide it.

IV. We do not think it was error to admit the answer of the witness Abrahams to the question in regard to the demeanor of the defendant upon his return to the camp-meeting. This answer was, "he was excited." In Alabama such an answer has been held inadmissible evidence. (*Gassenheimer* v. *The State*, 52 Ala., 314; *McAdory* v. *The State*, 59 Ala., 92.) But in other States such evidence has been held admissible. (*Culver* v. *Dwight*, 6 Gray, 44; *State* v. *Hudson*, 50 Iowa, 157; *Bromwell* v. *The People*, 38 Mich., 736; *People* v. *Lilly*, Id., 270.) Mr. Wharton says: "When the

opinion is the mere short-hand rendering of the facts, then the opinion can be given, subject to cross-examination as to the facts on which it was based." (Whart. Cr. Ev., § 458.) And he further says: "Opinion, so far as it consists of a statement of an effect produced on the mind, becomes primary evidence, and hence admissible whenever a condition of things is such that it cannot be reproduced and made palpable in the concrete to the jury." (Id., § 459; *Conner* v. *The State*, 6 Texas Ct. App., 455.) The object of all examinations in judicial tribunals is to elicit truth; and there are many cases where the form of questions and the manner of examination must be left to the discretion of the trial judge. No injustice can ordinarily be done by admitting such evidence, because it is not likely to prevail against a cross-examination or facts proved by other witnesses inconsistent with it.

V. As to the question propounded to defendant's witness Miller, by counsel for the State, about a gun, it was immaterial, as was subsequently shown by the other evidence in the case, and could not have had any effect upon the minds of the jury.

VI. We have carefully considered the charge of the court in the light of the objections made to it by counsel for defendant, and in our opinion it is not obnoxious to those objections. It appears to us to be a very full, fair and correct charge in all respects, presenting to the jury in a logical and plain way the law applicable to the evidence. There may be some slight inaccuracies in it, but there are none of a character calculated to confuse the minds of the jury, or to mislead them from a correct view of the law.

Because, in our opinion, the record shows that the defendant under the law is entitled to a new trial, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered May 20, 1885.]